**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CEDRIC REED,

                        Plaintiff,

    v.                                    No. 10-CV-609
                                                (NAM/CFH)

J. WOLCZYK; T. QUINN; DENISE B. SARRA,

                        Defendants[1],

---

**APPEARANCES:**

CEDRIC REID
Plaintiff Pro Se
00-A-6988
Livingston Correctional Facility
Post Office Box 91
Sonyea, New York 14556

HON. ERIC T. SCHNEIDERMAN
Attorney General for the
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**OF COUNSEL:**

CHRISTOPHER W. HALL, ESQ.
Assistant Attorney General

**CHRISTIAN F HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

   Plaintiff pro se Cedric Reed ("Reed"), an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, three DOCCS employees, violated his constitutional rights under the First and Fourteenth Amendments. Compl. (Dkt. No. 1).

---

   [1] Twenty-six defendants were previously dismissed by orders dated May 20, 2010 (Dkt. No. 31 and Dkt. Entry dated 5/25/2010) and April 26, 2011 (Dkt. No. 63).

  [2]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 78. Reid opposes the present motion. Dkt. No. 82. For the following reasons it is recommended that defendants' motion for summary judgment be granted and Reid's complaint dismissed.

# I. Background

The facts are related herein in the light most favorable to Reid as the non-moving party. See subsection II(A) infra. The specific facts of the case are set forth in the Report-Recommendation and Order filed March 30, 2011, familiarity with which is assumed. See Dkt. No. 60 (Report-Recommendation); Dkt. No. 63 (Decision and Order affirming the findings in the Report-Recommendation). Specifically, the Court dismissed all of Reid's claims except the (1) First Amendment retaliation claims against defendants Sarra and Quinn and (2) Fourteenth Amendment due process claim against defendant Wolczyk. Dkt. No. 60 at 9-10, 16. The facts discussed will be those relevant to the claims herein remaining. Those claims occurred during Reid's incarceration at Auburn Correctional Facility ("Auburn").

## A. First Amendment
### 1. Sarra's Misbehavior Report[3]

On January 8, 2007, Reid began attending a basic education course, focusing on writing,

---

[3] Both defendants and Reid cite to the hearing transcript from the disciplinary hearing following Sarra's misbehavior report in their papers supporting or opposing the pending motion. See Defs. Memoranda of Law (Dkt. No. 78-5); Pl. Memoranda of Law (Dkt. No. 85 at 17-33). This transcript was not provided to the undersigned, however, due to the papers which were filed, it was not required to determine the present motion.

2

reading, math, and science. Reid Dep. (Dkt. No. 78-3) at 19-20. Reid was initially assigned to classroom 1; however, that assignment was changed to classroom 10 to avoid the issuance of a misbehavior report given purported disagreements occurring between Reid and the staff. Id. at 41-42; Dkt. No. 82 at 10-11, 14. Reid disputes that there was any tension which would have amounted to a misbehavior report. Reid Dep. at 42; Dkt. No. 82 at 12. The transfer was allegedly approved by Sarra, Education Supervisor at Auburn; however, the interdepartmental memoranda indicates that third party Mogavero, Program Committee Chairperson, wrote the memoranda and authorized the transfers. Reid Dep. at 43; Dkt. No. 82 at 10-11.

On January 16, 2007, Reid sent a letter to defendant Sarra complaining about the teacher in classroom 10. Compl. ¶ 3; Reid Dep. at 16. Specifically, Reid contended that his teacher was chewing gum during her instruction of the class and it was very "disturbing and disruptive" to the learning environment. Reid Dep. at 16. Sarra responded the same day, advising Reid that it was not his responsibility to critique the teacher, encouraging him to stay focused on improving academically, and asking him to remain respectful of the educational setting by refraining from sharing his comments and opinions. Compl. ¶ 3(a); Reid Dep. at 17-19.

The following day, January 17, Sarra had Reid summoned from his classroom by an unidentified corrections officer, prior to its commencement to discuss Reid's recent complaints. Compl. ¶ 3(b); Reid Dep. at 21. Reid contends that Sarra came to his room to incite him. Sarra stated that she had already received two complaints from Reid regarding his teachers and she did not want to receive anymore. Compl. ¶ 3(c); Reid Dep. at 22. Reid then began to walk towards the classroom, at which time Sarra directed that he return

3

because she was not done discussing the issue with him. Reid Dep. at 22-23. Sarra continued speaking for a few additional minutes, during which time Reid admits that he was visibly upset, stated that he was "done" speaking with Sarra, and failed to engage in any further dialogue regarding his complaint or the teacher. Id. at 23-35. After several unsuccessful attempts to get Reid to further converse with her, Sarra then directed Reid to go to a waiting room, instead of his classroom, until he was released to his housing unit. Compl. ¶ 3(c); Reid Dep. at 35-36. Additionally, dated January 17, was a memoranda indicating that Reid was to be transferred to a different adult basic course, effective January 22, 2007, per Sarra's request. Reid Dep. at 38-39; Dkt. No. 82 at 16. However, the time that memorandum was written is unclear.

On January 18, 2007, Reid was served with a misbehavior report, authored by Sarra, alleging violations of a direct order and interference with an employee. Compl. ¶ 3(d); Reid Dep. at 36. Sarra indicated in the report that:

> [Sarra] went to the classroom number 10 in response to a memo that [Reid] sent her . . . to discuss the content of [that] memo. [Sarra] referenced [her] response to [Reid's] memo stating that [Reid's] job in the classroom is to do his assigned work, not to critique his teacher nor make opinionated comments about her . . . Reid became agitated . . . turned away from [Sarra[ and said, "I'm done with you."

Reid Dep. at 30-32. Reid was then keeplocked[4] from January 18 through January 23. Id. at 37. Reid was subsequently found guilty of both violations during a disciplinary hearing on January 23, 2007 and given thirty days of keeplock confinement. Compl. ¶ 3(h); Reid Dep. at 37. Reid unsuccessfully appealed his disciplinary disposition. Compl. ¶ (i)-(j); Reid Dep.

---

[4] Keeplock is a form of disciplinary confinement where an inmate is confined to his cell for the duration of the disciplinary sanction. Gittens v. LeFevre, 891 F.2d 38, 39 (2d Cir. 1989) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 251-1.6 (2012)).

4

at 37-38.

Reid completed his keeplock term and then returned to the adult basic education course, although assigned to a new teacher. Reid Dep. at 38, 40. Reid also filed a grievance regarding his removal from the adult basic class as a result of the complaint he lodged against his former teacher, although the grievance never mentions Sarra or the alleged retaliation. Id. at 44-46. Reid also contends that "Sar[ra] was . . . in a position where she could have moved [him] prior to the issuing of a ticket . . . like she did in the other grievance, to avoid a possible ticket." Id. at 48. However, as previously stated, both memoranda approving room changes were authored by third party Mogavero. Dkt. No. 82 at 10, 16.

### 2. Quinn's Misbehavior Report

On March 28, 2007, Reid filed a grievance against three unidentified Auburn employees. Compl. ¶ 4. Within the grievance, Reid stated that an IT supervisor, "due to her old, old age," was slow in completing her job duties and that a corrections counselor, was "so desperate for attention that she wears pants that are three sizes too small just to catch the eyes of prison inmates that are just as desperate as she is." Reid Dep. at 49. On April 4, 2007, defendant Quinn, a lieutenant at Auburn, lodged a misbehavior report against Reid, citing Reid's prior grievance as the basis for the report, charging him with stalking and harassment or the staff. Compl. ¶ 4(a)-(b); Reid Dep. at 50-51. Reid was subsequently placed in keeplock. Reid Dep. at 63. Quinn further stated that the misbehavior report was based on the aforementioned statements only, and "not issued for reprisal for [Reid's] grievance." Reid Dep. at 49. Reid contends that he never meant to harass anyone and

5

that, since the statements were written and not verbal, harassment was not possible. Id. at 53.

## B.  Due Process

On April 9, 2007, defendant Wolczyk, Commissioner's Hearing Officer at Auburn, presided over the disciplinary hearing which arose in conjunction with Quinn's misbehavior report.  Compl. ¶ 4(c).  Wolczyk commenced the hearing by reading the misbehavior report into the record and receiving Reid's pleas of not-guilty.  Dkt. No. 78-4 at 2, 6-7.  Wolczyk denied Reid various items which he had requested, specifically the South Mess Hall surveillance video footage and log book entries, primarily due to their lack of relevance to the question surrounding the validity of his misbehavior report.  Id. at 5-6, 11-13.  There is no dispute that three individuals testified at the hearing, Quinn, Parmiter, and Superintendent Graham.  Reid Dep. at 54-55.  Reid's initial request to have Superintendent Graham testify was denied, however, after hearing the testimony Wolczyk reconsidered and granted the requested witness.  Dkt. No. 78-4 at 14, 27-28.  Reid also sought the testimony of his inmate assistant, Howard, but it too was denied.  Reid Dep. at 54-55; Dkt. No. 78-4 at 15.  While Reid acknowledges that Wolczyk allowed him to question the witnesses, Reid contends Wolczyk was biased because there were several questions which he prohibited Reid from posing and interrupted his colloquies.  Reid Dep. at 14, 56; Dkt. No. 78-4 at 70. The transcript also shows that Reid was given an opportunity to comment at the conclusion of each witness' testimony.  Dkt. No. 78-4 at 26, 33, 70.

During Quinn's testimony, he explained that this was not a case of retaliation.  Dkt. No. 78-4 at 40.  Instead, Quinn had examined Reid's grievance, determining that certain claims

6

were potentially meritorious, primarily those regarding third party Cox who allegedly acted as a hearing officer to a grievance in which he was also named as an offending party. Id. at 41. Quinn also explained that the remainder of Reid's grievance, outside of those legitimate allegations against Cox, was based on irrelevant, false, and harassing comments about two completely unrelated parties. Id. at 41. It was those irrelevant, false, and harassing comments which served as the basis for the instant misbehavior report. Id. at 57 ("those charges were . . . solely based on the . . . inappropriate comments that were added to [Reid's] . . . grievance.").

Also during Quinn's testimony, and in major part due to questions Reid posed, Wolczyk paused the hearing in order to retrieve both the DOCCS and Auburn facility manuals to elicit whether Quinn could identify an express prohibition in those policies for inappropriate or potentially offensive language being used by an inmate in his grievance. Dkt. No. 78-4 at 53-54. No such provision was found. Id. At the close of the testimony, Reid provided a closing statement. Id. at 72-75.

Wolczyk weighed the evidence of (1) the misbehavior report and testimony of Parmeter, Graham, and Quinn on the one hand with (2) Reid's testimony and the fact that neither facility nor state policy prohibited the comments within the grievance. Dkt. No. 78-4 at 76. Wolczyk ultimately determined that while

> Reid has a constitutional right[, it is] not an unlimited right to file a grievance. In this instance, the content of the grievance is not meant to complaint about but to harass the persons' named therein and have nothing to do with the subject of the grievance, Sergeant Cox. Inmate Reid has [seven] prior Harassment Charges. These were considered as aggravating factors. Attempts at harassment of Staff through the grievance process will not be tolerated.

Id. at 76-77.

7

Wolczyk found Reid guilty of harassment, but not guilty of stalking, and imposed a disposition of six months (1) segregation in the Special Housing Unit ("SHU")[5]; (2) loss of privileges; and (3) loss of good time credits. Compl. ¶ 4(c); Dkt. No. 78-4 at 75-76. Reid went to SHU from keeplock status on April 17, the date the disposition was rendered. Reid Dep. at 62-64. Reid appealed the decision to Superintendent Graham, who modified the disposition to thirty days SHU and a reinstatement of Reid's good time credits. Compl. ¶ 4(e); Reid Dep. at 57-59. Reid's new release date from SHU was May 4, 2007. Compl. ¶ 4(e). Reid was ultimately released from SHU on May 6, 2007. Reid Dep. at 64. Reid again appealed the disposition to third party Dubray on May 15, 2007, who ultimately reversed the disciplinary disposition altogether. Compl. ¶ 4 (f)-(g); Reid Dep. at 56-57; Dkt. No. 82 at 15.

## II. Discussion

Reid contends that his First Amendment rights were violated when Sarra and Quinn authored retaliatory misbehavior reports against him. Reid also alleges that his Fourteenth Amendment rights were violated when he was subjected to a disciplinary hearing without appropriate due process. Defendants contend that Reid's claims are meritless and that they are protected by qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to

---

[5]SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

8

any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they 'suggest. . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . or arguments that the submissions themselves do not "suggest, . . ." that we should not "excuse frivolous or vexatious filings by pro se litigants" . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

9

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

### B. Retaliation

Reid contends that both Sarra and Quinn retaliated against him by filing a misbehavior report against Reid in retaliation for his prior actions of filing grievances. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone are insufficient. Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)

Reid has successfully shown that he was engaged in protected conduct as filing grievances, or letters which in essence amount to grievances, satisfies the first prong of the analysis. Tafari v. McCarthy, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (citing Gayle v. Gonyea, 313 F.3d 677, 683 (2d Cir. 2002)). Furthermore, confinement in keeplock for a period of weeks has also been deemed to be an adverse action. Gill v. Pidlypchak, 389 F.3d 379, 383 (2d Cir. 2004). However, defendants contend that because these actions would have been taken regardless of the filing of the grievances, their "action[s] may be upheld [since they] . . . would have been taken based on the proper reasons alone." Graham, 89 F.3d at 79 (citations omitted). Defendants' contentions are supported by the instant record, thus Reid has failed to raise a question of material fact with respect to the retaliation claims lodged against either defendant.

### 1. Sarra's Misbehavior Report[6]

Reid acknowledges that much of the behavior noted in Sarra's misbehavior report is true. Namely, when Sarra began to speak with Reid about the complaint that he had earlier filed, Reid responded by becoming visibly agitated, attempting to walk away, dismissing Sarra's additional questions, and failing to engage in any further meaningful dialogue. Sarra continually attempted to converse with Reid by asking him various questions, and Reid admits that he stated that he was "done" with Sarra and, despite her continued and concerted efforts, refused to engage in any further conversation. Reid's admitted actions substantiated Sarra's misbehavior report because he refused to speak with Sarra, despite her clear intentions to engage him in conversation, and frustrated her abilities to appropriately perform her duties. Accordingly, defendants have shown by a preponderance of the evidence that Reid's actions would have precipitated the misbehavior report whether or not he had previously filed the letter of complaint against his teacher. As such, defendants' motion on this ground should be granted.

### 2. Quinn's Misbehavior Report

Through Quinn's testimony, it is also clear that by a preponderance of the evidence defendants' have demonstrated that the misbehavior report was filed for proper purposes. Quinn explained that part of Reid's grievance was legitimate and required investigation.

---

[6] To the extent that Reid relies upon the argument that Sarra should have switched his classroom placement in lieu of writing the misbehavior report, such contentions are meritless. First, as discussed infra, Reid's actions gave rise to the misbehavior report and it was appropriately issued. Finally, Sarra was not the individual authoring the memoranda approving classroom transfer. Instead that was third party Mogavero.

12

However, Quinn also articulated that Reid included additional information in the grievance, regarding staff members' age, size, and dress, which had no bearing on the legitimate portion of the grievance. These statements which Reid made about the two other individuals were irrelevant and solely for purposes outside of the aim of the grievance process.

It is undisputed that DOCCS has a legitimate penological interest in protecting the safety and welfare of both the inmates and staff, and that living within a correctional facility presents challenges whereupon instances which may be perceived as minimal annoyances outside facility walls are viewed as serious transgressions and threats due to responsibilities entrusted to DOCCS administration and staff. Due to the inappropriate and insensitive nature of Reid's statements, in conjunction with the context of the prison environment, these statements were deemed harassing. Quinn made it clear that such sentiments, regardless of whether they had been written in a grievance or letter, or verbally stated, formed the basis of the offending behavior and were unacceptable. Accordingly, it was the context and intent of Reid's statements, not the medium in which they were delivered, that resulted in the misbehavior report. Thus, defendants' motion on this ground should be granted.

### C. Due Process

Reid contends defendant Wolczyk denied him due process during his disciplinary hearing. However, "the Constitution d[oes] not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000) (citing

Sandin v. Connor, 515 U.S. 472, 484 (1995)) (internal quotation marks omitted).

### 1. Atypical and Significant Hardship

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). The Second Circuit has failed to establish "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration – between 101 and 305 days – development of a detailed record of the conditions

14

of confinement relative to ordinary prison conditions is required." Id. at 64-65 (citing Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. Id. (citing Colon, 215 F.3d at 231-32). Additionally, "[i]n the absence of a detailed factual record, [the Second Circuit] has affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short – less than . . . [thirty] days – and there was no indication that the plaintiff endured unusual SHU conditions." Id. (citations omitted); see also Smart v. Goord, 441 F. Supp. 2d 631, 640 (holding that Second Circuit decision "are unanimous that keeplock of [thirty] days or less in New York prisons is not atypical or significant . . . under Sandin.") (internal quotations marks and citations omitted).

In this case, Reid has failed to establish the atypicality required by Sandin. After receiving his disposition's modification, Reid spent approximately thirty-one days in disciplinary confinement. There is no indication that the time which Reid spent in confinement was in any way unusual or atypical. Given the status of the detailed factual record, and the complete absence of any allegations by Reid that his disciplinary confinement was anything other than ordinary, defendants' motion on this ground should be granted.

### 2. Procedural Due Process

Even assuming that Reid did establish a question of material fact regarding the

atypicality of his disciplinary confinement, he has failed to establish that he was denied the appropriate procedural protections. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

Specifically, Reid contends that Wolcyzk was not an impartial hearing officer because he did not allow Reid to ask all the questions of the witnesses which he desired and because Wolcyzk interrupted Reid during his colloquies. Prisoners have a constitutional right to a fair and impartial hearing officer. See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . " and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487-88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

It is clear that Reid's disciplinary disposition was based on reliable evidence of his guilt. Reid's grievance, which Quinn reviewed, was irrefutably authored by Reid, authenticated by both his inmate name and inmate identification number. Dkt. No. 78-4 at 64. Reid also

16

admitted to writing the statements which were within the grievance. Id. at 9-11, 64. Thus, there was no question that the statements regarding the staff members' age, physical appearance, and dress were made by Reid. Moreover, during the testimony, Quinn explained that a portion of Reid's grievance was extremely legitimate, but that these additional statements about unrelated staff members were irrelevant and false. Accordingly, they did not conform with the purposes of the grievance process and were not made in an attempt to support the legitimate claims which Reid asserted. Instead, they were meant to harass. Wolczyk carefully considered the competing evidence, namely the undisputable contents of the grievance with the fact that the inmate policies for both DOCCS and Auburn did not explicitly prohibit including such derogatory language in inmate grievances. Ultimately, Wolczyk reasoned that an inmate's right to petition is qualified and that, given the environment of prisons and Reid's disciplinary history, such harassing statements should and would not be tolerated.

Reid was denied the opportunity to call a witnesses and gather some requested evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) (internal quotations and citations omitted); see also Richardson, 833 F. Supp. at 152. Reid's inmate assistant was not permitted to testify; however, he did not observe what transpired on the day that Reid wrote the grievance or Quinn reviewed it and authored the misbehavior report. Thus, his testimony would not assist Wolcyzk in arriving on a decision regarding the appropriateness of the misbehavior report. The same is true for the evidence which was denied. "Courts have long recognized . . . that the right to know evidence supporting prison disciplinary

17

rulings is not absolute." Sira, 380 F.3d at 74 (citations omitted). Accordingly, discovery of documents regarding log books and video surveillance around mess halls would also be of no value in determining the validity of the disciplinary ticket.

Reid was provided with an opportunity to extensively question his witnesses through Wolczyk. "While inmate do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." Rivera v. Wohlrab, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002). Thus, Wolczyk retained the authority and discretion to administer the questioning in a manner he saw fit. While Wolczyk did not permit Reid to ask every question, a review of the hearing transcript shows that he did permit Reid to question the witnesses rather extensively. Moreover, when Wolczyk denied Reid's questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.

Furthermore, it was clear that Wolczyk was objective and carefully listened to the testimony and arguments presented by Reid as Wolczyk reversed his prior decision about allowing Graham to testify as well as pausing the hearing to allow a copy of the DOCCS and facility policies to be provided to Quinn to determine whether there was an express prohibition against distasteful and arguably offensive language forming the basis of an inmate's grievance. Wolczyk also allowed Reid to make an extensive closing statement prior to his deliberation and determination. Wolczyk also deemed Reid not guilty of one of the proffered charges.

Accordingly, despite Reid's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Reid was provided. As Reid received all process to which he was entitled, defendants' motion should

18

be granted on this ground.

## D. Qualified Immunity

Finally, defendants claim that even if Reid's constitutional claims are substantiated, defendants are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be reached concerning any of Reid's claims because, for the reasons discussed above, Reid has failed to raise a question of fact as to the first prong of the inquiry.

Accordingly, in the alternative, defendants' motion on this ground should be granted.

## V. Conclusion

For the reasons stated above, it is hereby recommended that defendants' motion for summary judgment (Dkt. No. 78) be **GRANTED** as to all claims and all defendants and Reid's complaint be **DISMISSED** with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: October 23, 2012
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge